UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| RONALD PATTEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil No. 6-202-P-H |
| | ) |
| CITY OF PORTLAND, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**RECOMMENDED DECISION ON UNOPPOSED MOTION FOR SUMMARY JUDGMENT AND ORDER ON MOTION FOR SANCTIONS**

Ronald Patten filed a complaint in this court alleging discrimination. In his complaint Patten also indicates that Frank Occhipinti has been discriminated against. Patten lists the City of Portland as his sole defendant.[1] The City has filed a motion for summary judgment (Docket Nos. 25 & 26) to which Patten has not responded. The City has also filed a motion for sanctions (Docket No. 24) because Patten failed to appear and submit to a deposition after this court ordered him to do so. I conclude that the City has demonstrated its entitlement to judgment as a matter of law on the unopposed statement of material facts and I recommend that the Court grant its motion for summary judgment. Because the motion for sanctions seeks the same relief, it would be moot if the Court accepts the following recommendation.

---

[1] This is not Patten's only complaint in this court. Patten filed a complaint against the Town of York that in ways parallels his complaint in this action and I recommended summary dismissal of that action for failure to state a claim. See Patten v. Town of York, Civil No. 06-203-P-H, 2006 WL 3922022 (D. Me. Dec. 12, 2006).

*Discussion*

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d 8, 17 (1st Cir. 2007) (quoting Federal Rule of Civil Procedure 56(c)).  I draw all reasonable inferences in favor of Patten, but where he bears the burden of proof, he "'must present definite, competent evidence' from which a reasonable jury could find in [his] favor." Id. (quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992)).

Patten has not presented any evidence in defense of the motion for summary judgment.  However, this court,

> may not automatically grant a motion for summary judgment simply because the opposing party failed to comply with a local rule requiring a response within a certain number of days. Rather, the court must determine whether summary judgment is "appropriate," which means that it must assure itself that the moving party's submission shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also* Advisory Committee Note to Rule 56 ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.").

NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7 -8 (1st Cir. 2002)

**Undisputed Material Facts**

Patten is an individual living in Haverhill, Massachusetts.  (SMF ¶ 2.)  The City of Portland is a municipality in the State of Maine.  (Id. ¶ 3.)

Patten's complaints against the City allege discrimination because of a disability. (Id. ¶ 5.) While the particular forms of discrimination claimed include discrimination due to Patten's disability, another complaint of discrimination is that the City refused to accommodate his disability by granting him alternative employment. (Id. ¶¶ 6 &7.) It is also possible to read his complaint as alleging claim of discrimination because of his religion and/or his age. (Id. ¶¶ 8-9.) [2]

With regards to the factual issues underlying Patten's claims against the City, the City sets forth the following statements. Patten was a crossing guard for the City of Portland who was first hired on September 5, 2002, and who was terminated from this position on November 19, 2004. (Id. ¶ 18.) Patten worked about two hours a day during the school year. His schedule generally was from 8:00 a.m. to 9:00 a.m. and from 3:00 to 3:45 p.m. Monday through Friday. (Id. ¶ 19.)

Crossing guards are hired by the City's Parking Division at the beginning of each school year (and during the school year if necessary) and then laid off at the end of the school year. (Id. ¶ 20.) The hiring process begins again each school year; the crossing guards are not automatically called back at the end of the summer. (Id. ¶ 21.) The crossing guards are considered temporary employees under the City's personnel policies and are not eligible for any City benefits, other than those mandated by law, such as participation in the part time, seasonal, and temporary retirement plan. (Id. ¶ 22.)

---

[2] The defendant also sets forth facts pertinent to its motion for sanctions as follows. In response to a discovery dispute letter this court scheduled and conducted a hearing on July 25, 2007. (Id. ¶ 10.) As a result of that hearing the court issued an order requiring Patten to appear for a deposition on August 1, 2001, at 9:00 a.m. at the offices of defense counsel. (Id. ¶ 11.) At the hearing the court clearly explained to Patten what was entailed in his appearing for this deposition and Patten indicated that he understood this explanation. (Id. ¶¶ 12, 13.) The City noticed the deposition in accordance with the court's order. (Id. ¶ 14.) Patten did not appear at the deposition. (Id. ¶ 15.) Instead, Patten, unbeknownst to defense counsel, hand delivered documents to counsel's office on August 1, 2007, at approximately 1:42 p.m. (Id. ¶ 16.)

Patten was first hired on September 5, 2002, laid off on July 1, 2003, rehired September 3, 2003, laid off June 17, 2004, rehired September 7, 2004, and terminated from his position on November 19, 2004.  (Id. ¶ 23.)  He was terminated for failure to follow policies and direct orders.  (Id. ¶ 24.)

Patten received specific training as to his duties upon hire which are reviewed annually at the beginning of each school year.  (Id. ¶ 25.)   Patten received a copy of the "School Crossing Guard's Policies and Procedure."  (Id. ¶ 26.)

Andrew Martin, the City's supervisor of crossing guards, and John Peverada, the parking division head, randomly drive to places where crossing guards are assigned in order to make sure that the policies are being followed and that the guard is on duty.  (Id. ¶ 27.)  Parking control officers report to Martin if they notice a crossing guard failed to appear on duty or is late.  (Id. ¶ 28.)

Throughout his employment with the City, Patten was assigned with another crossing guard to a major intersection at Longfellow Square, where Congress, State, and Pine Streets intersect near Longfellow Monument.  (Id. ¶ 29.)  Reiche Elementary School is located near the intersection of Pine Street and Brackett Street.  (Id. ¶ 30.)  Patten and his partner were told to have one person at the northwest corner of State and Congress to help children coming up State Street toward Reiche and the other person on the opposite side of State Street across Congress Street.  (Id. ¶ 31.)  There is a triangular median for pedestrians in the middle of the intersection, with a crosswalk from State Street to the triangle, and then a crosswalk from the triangle to the other side of the intersection.  (Id. ¶ 32.)  The crossing guards were to be on each side of the triangle in order to cross

4

children in these two crosswalks. (Id. ¶ 33.) Patten had been assigned to the same intersection in the 2002 and 2003 school years. (Id. ¶ 34.)

Martin had a few calls of complaints from residents in the spring of 2004 regarding the fact that Patten and his partner were ignoring children who needed to cross the State Street intersection. (Id. ¶ 35.) Martin spoke to Patten and his partner about the complaints near the end of the school year in the spring of 2004 and thought that this conversation resolved the issues. (Id. ¶ 36.) However, during random checks of intersections during the fall of 2004, Martin observed Patten and his partner were both standing on the same side of Congress Street near Pine Street. (Id. ¶ 37.) Patten and his partner had been told at least four times in the fall of 2004 that each was to be on opposite sides of Longfellow Square. (Id. ¶ 38.) Patten had refused on the grounds that it was too cold for his feet to stand on the corner of State and Congress Street but the issue was resolved each time when his partner agreed to go across the street. (Id. ¶ 39.) Martin pointed out to Patten that there was no temperature difference between the two sides of the street. (Id. ¶ 40.) In addition, more than once Patten left his post prior to 9:00 a.m., claiming that he had to go use a bathroom even though the shift was only one hour long. (Id. ¶ 41.) Patten was observed on a few occasions to be late in reporting. (Id. ¶ 42.)

Once, Peverada, the head of the parking division, saw Patten on lower Congress Street waiting for a bus after 8:00 a.m. when Patten should have been working. (Id. ¶¶ 43 & 44.) Peverada gave Patten a ride to his post at State and Congress Streets. (Id. ¶ 45.) Martin spoke to Patten more than once about being late for his shift. (Id. ¶ 46.)

Additionally, in the fall of 2004, Martin had several telephone complaints and at least one written complaint regarding Patten and his partner failing to cross children at the intersection of Congress and State Streets. (Id. ¶ 47.) As a result of these complaints Martin went to the intersection on the afternoon of November 17, 2004, to observe Patten and his partner from Martin's vehicle. (Id. ¶ 48.) Martin observed Patten and his partner standing on the same side of Congress Street, near Pine Street, talking to each other. (Id. ¶ 49.) Patten was writing in a notebook and was not paying attention to the intersection. (Id. ¶ 50.) Marten observed two children cross the street on a diagonal and neither Patten nor his partner observed the children until they were almost across the street. (Id. ¶ 51.)

As a result of his observations, Martin asked Peverada to join him the following morning in another observation of the intersection with Patten and his partner. (Id. ¶ 52.) On November 18, Peverada and Martin observed the intersection for approximately fifteen minutes. (Id. ¶ 53.) Patten and his partner were approximately five minutes late arriving. (Id. ¶ 54.) They positioned themselves on the same side of the street again, contrary to multiple direct instructions given to them. (Id. ¶ 55.) Martin and Peverada approached Patten at that time; Patten did not appear to be paying close attention to his duties. (Id. ¶ 56.) When Martin and Peverada approached him Patten accused them of harassing him and made incoherent statements about non-city officials, including the Governor, giving him permission to stand where he was standing. (Id. ¶ 57.) Patten said that he would sue the City and that he was disabled and that the City was putting him in harm's way by asking him and his partner to cross the kids the way that it did. (Id. ¶ 58.)

Martin drafted a memorandum on November 18, 2004, describing the events of November 17 and 18, and followed up with a notation on December 6, 2004. (Id. ¶ 59.)

After consulting with Peverada, who spoke with his boss, Director of Human Resources Gloria Thomas, Martin terminated Patten's employment on November 19, 2004, by verbally informing him he was terminated. (Id. ¶ 60.) Patten subsequently requested a written termination letter which Martin gave him. (Id. ¶ 61.)

Prior to his statements of November 18, 2004, neither Martin nor Peverada ever had any information that Patten was claiming a disability or that he believed he was being put in any sort of work situation which was potentially harmful to him. (Id. ¶ 62.) The only thing that Patten told Martin was that it was too cold for his feet to stand on one side of Congress Street rather than the other. (Id. ¶ 63.) Patten never requested any accommodation for a perceived disability. (Id. ¶ 68.)

The sole reasons for terminating Patten were because he was not following the crossing guard policies and procedures and had violated a direct work order on several occasions. (Id. ¶ 64.) Neither any alleged disability nor any reporting of a perceived safety issue to Patten were factors in Martin's decision to terminate Patten. (Id. ¶ 65.) Neither Martin nor Peverada knew Patten's religion and they did not know anything about Patten being a lay minister; Patten never discussed his religion with them. (Id. ¶ 66.) Religion played no part in Martin's decision to terminate Patten. (Id. ¶ 67.)

As of March 2005, the City had numerous crossing guard employees who were older than Patten, who was born in 1956. (Id. ¶ 69.) Between 2001 and March 23, 2005, the City dismissed three crossing guards who were younger than Patten, specifically Joseph Gladu (born in 1965), Yvonne Wright (born in 1966), and Philip De Weaver (born in 1983). (Id. ¶ 70.) Martin's decision to terminate Patten had nothing whatsoever to do with Patten's age. (Id. ¶ 71.)

*Age Discrimination*

As a plaintiff alleging age discrimination Patten must make a prima facia showing of discrimination. He, "must demonstrate that he (1) was at least forty years of age, (2) met the employer's legitimate job performance expectations, (3) experienced adverse employment action, and (4) was replaced by a person with roughly equivalent job qualifications." Goldman v. First Nat. Bank of Boston, 985 F.2d 1113, 1117 (1st Cir. 1993). In the face of the record forwarded by the defendants, Patten has not created a genuine dispute of fact that he did meet the City's legitimate job performance expectations.

*Religious Discrimination*

Patten has also failed to create a genuine dispute of fact to justify a trial on a religious discrimination claim. A prima facia case for such a claim of religious discrimination based on a failure to accommodate, the plaintiff must show that "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the employer's attention, and (3) the religious practice was the basis for the adverse employment decision." EEOC v. United Parcel Serv., 94 F.3d 314, 317 (7th Cir.1996); accord E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F.3d 49, 55 (1st Cir. 2002).

There is no evidence in this record that Patten's religious practice conflicted with his employment requirement, that Patten brought the practice to the City's attention, or that his (undisclosed) religious practice was a basis for the City's adverse employment decision.

8

*Physical Disability*

Even less ink needs to be spilled apropos any claim by Patten that a physical disability was the reason for his termination as a crossing guard or that the City failed to accommodate a disability.  There is no record evidence that Patten suffers from any physical disability within the meaning of the applicable law.  See, e.g., Tardie v. Rehabilitation Hosp. of R.I., 168 F.3d 538, 541 (1st Cir. 1999); Whitney v. Wal-Mart Stores, Inc., 2006 ME 37, ¶ 9, 895 A.2d 309, 312.  There is no basis for the Court to even begin to delve in the more nuanced layers of discrimination law that often arise at the summary judgment analysis of such claims.

*Conclusion*

On the record and for the reasons set forth above, I recommend that the Court grant the defendant's motion for summary judgment.  Should the court accept this recommendation the motion for sanctions would be moot.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

August 31, 2007                                    /s/ Margaret J. Kravchuk
                                                             U.S. Magistrate Judge